UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRIBE OF TWO, LLC,

                              Plaintiff,

             -against-

TOD'S S.P.A. and DEVA, INC.,

                          Defendants.

23-CV-3255 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

This case is a trademark infringement action centering on two different fashion brands' usage of logos consisting of two interlocking letter T's. Plaintiff Tribe of Two, LLC ("Tribe of Two") brings this action against Defendants Tod's S.p.A. and Deva, Inc. (collectively, "Tod's"), alleging willful infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125. Defendants Tod's bring counterclaims against Tribe of Two for violating the Lanham Act. Presently before the Court are the parties' cross-motions for summary judgment, motions to preclude expert testimony, and motions to seal. Based on the undisputed facts in this case, the Court concludes that no reasonable juror could find a likelihood of confusion between the two marks. For this reason and those stated herein, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment. Accordingly, the Court DENIES the parties' *Daubert* motions as moot. The Court GRANTS the parties' Motions to Seal.

**BACKGROUND**

I.     **Statement of Facts**

The following facts are taken from the parties' Federal Rule of Civil Procedure 56.1 statements and supporting materials. ECF No. 192 ("Def. 56.1"); ECF No. 215 ("Pl. 56.1"); ECF

No. 216 ("Joint 56.1"); ECF No. 235 ("Def. Counter 56.1"); ECF No. 258 ("Pl. Counter 56.1").

Unless otherwise indicated, the Court only cites a 56.1 statement where (1) the parties have agreed the factual assertion is undisputed; and (2) the factual assertion is properly supported by a citation to the record. This includes instances where a party does not truly "dispute" an assertion, but merely seeks to qualify or add their own "spin" to it. *See Kaye v. New York City Health and Hosps. Corp.*, No. 18-CV-12137 (JPC), 2023 WL 2745556, at *2 n.2 (S.D.N.Y. Mar. 31, 2023). The Court also relies on certain exhibits filed by the parties in connection with the instant motions as cited herein, and any relevant pleadings in this case.

In 2012, Brenda Schad, a former runway and print model, and her best friend, Jeannine Maggi, founded the brand Tribe of Two based on a desire to provide "durable purse[s] with sufficient space for necessary items." Def. 56.1 ¶¶ 1–2, 4. Ms. Schad chose the name "Tribe of Two," because the word "tribe" references her Native American heritage, while the word "two" reflects the friendship between the cofounders, Ms. Schad and Ms. Maggi. Joint 56.1 ¶ 4. In 2013, Ms. Maggi stopped participating in the operation of the business. Def. 56.1 ¶ 7. In 2015, Ms. Schad added her daughter, Sterling Victoria Laborie, as a new member of Tribe of Two. *Id.* ¶ 8. Ms. Schad owns 99% of the business, while Ms. Laborie owns 1%. *Id.* Ms. Schad is "responsible for everything relat[ed] to" Tribe of Two, and operates "pretty much as a one woman show." *Id.* ¶ 9 (internal quotation marks omitted).

In conceiving of Tribe of Two's logo, Ms. Schad wanted a logo with two letter "T's" to stand for "Tribe of Two," and then inverted one of the T's to create a Roman numeral II. *Id.* ¶ 17. In May 2012, Ms. Schad retained graphic designer Scott Cimock to implement her ideas and design Plaintiff's logo. Joint 56.1 ¶ 5. On May 20, 2012, directly after completing the design process with Mr. Cimock, Ms. Schad filed an intent-to-use application on behalf of Plaintiff with

the United States Patent and Trademark Office ("USPTO"), seeking to register the mark shown

below ("Plaintiff's Mark" or "Mark") for "purses and wallets." Def. 56.1 ¶ 20.



*Id.* In her USPTO application, Ms. Schad described the Mark as: "The literal element of [the]

mark consists of Tribe of Two Capital 'T's. The mark consists of two capital Ts made one right

side up and one upside down to form a Roman numeral II." *Id.* ¶ 21.

Tribe of Two began using this Mark as early as December 1, 2012. Pl. 56.1 ¶ 10. On July

30, 2013, the USPTO issued a registration under Registration No. 4377523. *Id.* ¶ 11. This

registration became incontestable under Section 15 of the Lanham Act (15 U.S.C. § 1065) as of

August 17, 2018. *Id.* ¶ 13. On January 23, 2019, Plaintiff filed an application to register a version

of Plaintiff's Mark with only the double T design (without the words "Tribe of Two"). *Id.* ¶ 14.

On December 3, 2019, the USPTO issued a registration under Registration No. 5924569. *Id.* ¶

15. Both of Plaintiff's registrations, Nos. 4377523 and 5924569, were issued by the USPTO

without requiring proof of secondary meaning. Joint 56.1 ¶¶ 10, 14.

Plaintiff has used its Double T logo in connection with the sale of luxury handbags,

which are produced using python, leather, vegan leather, or other exotic skins. Def. 56.1 ¶ 26; Pl.

56.1 ¶ 2. Plaintiff prices its handbags between "a little under $1,000 to over $3,000." Def. 56.1 ¶

27.

Much of Plaintiff's advertising takes place "by word of mouth," as well as through product placement, special events, invitation-only showings, magazine advertisements, and other materials, such as business cards, posters, and flyers. *Id.* ¶¶ 28, 31–32. Plaintiff spent approximately ▮▮▮▮ in "advertising and marketing" expenses between 2013 and 2024. *Id.* ¶ 28. Plaintiff has not utilized media buys, television, radio, or third-party website advertising. *Id.* ¶ 30. However, Plaintiff attests that its products were placed on broadcast television shows, including *Scandal* and *Animal Kingdom*. *Id.* ¶ 33. Plaintiff's Mark was not visible in either show. *Id.*

Plaintiff's channels of trade include "house parties, invitation-only trunk shows and other private events, consignment sales at stores, direct sales to stores, the Tribe of Two website, and two to three trade shows." *Id.* ¶ 34. Plaintiff's top two channels of sales by revenue are ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 35. Ms. Schad testified that she conducted approximately ten in-home sales events per year between 2014 and 2019, but has not held any such events since the onset of the COVID-19 pandemic in early 2020. *Id.* ¶ 36. Plaintiff's website has accounted for approximately ▮▮ of Plaintiff's sales. *Id.* ¶ 38. Plaintiff's bags have been listed on third-party websites, but Plaintiff has never sold any bags through that channel. *Id.* ¶ 37.

Plaintiff's total revenues from its inception in 2012 through 2022 were in "the range of approximately $200,000 generated from the sale of approximately 200 bags." *Id.* ¶ 40. Plaintiff, however, notes that it made sales through informal and event-based channels, in which "invoices and payments were handled manually and may not have been fully captured in electronic records." Pl. Counter 56.1 ¶ 40. Between November 2019 and January 2022, Plaintiff made approximately five recorded sales. Def 56.1 ¶ 42.

Many, although not necessarily all, of Plaintiff's bags have metal bag tags on the inside of the bags that bear Plaintiff's Mark, which includes the words "TRIBE OF TWO" above the Double T design. *Id.* ¶ 47. Plaintiff also asserts that all of its products feature the Double T design without the "Tribe of Two" wording above it on "interior and exterior zipper pulls" and dust bags. Pl. Counter 56.1 ¶¶ 47–48. Plaintiff did produce bags that had the Double T affixed to the outside of the bag, but the parties dispute the extent to which Plaintiff sold these bags. *See* Def. 56.1 ¶ 49–52; Pl. Counter 56.1 ¶ 49–52.

"Defendant Tod's is an Italian fashion company that owns the luxury brand TOD'S and is best known for its driving shoes." Def 56.1 ¶ 53. Defendant Deva, Inc. is a New York corporation that is indirectly owned by Tod's and is responsible for distributing TOD'S products in the U.S. market, including direct sales to Tod's stores, department stores, and specialty retailers. *Id.* ¶ 54. Defendants offer a wide range of products in the United States, including shoes, handbags, small leather goods, apparel, and accessories, although the main category of products Defendants sell are shoes. *Id.* ¶¶ 55–56.

Defendants distribute their products through multiple channels, including online at the TOD'S branded website, at boutiques and franchised outlets, major department stores, and specialty retailers. *Id.* ¶¶ 69, 71. According to Defendants, approximately 75% of U.S. consumer sales from 2015-2022 occurred through Defendants' boutiques and outlets, and approximately 8% through Defendants' branded website. *Id.* ¶ 70. Plaintiff disputes these figures as not being "supported by production of underlying source sales records," although Plaintiff does not cite particular parts of the record to dispute Defendants' numbers. Pl. Counter 56.1 ¶ 70. Defendants also sold goods with their Double T mark at department stores, including Saks Fifth Avenue, Nordstrom, Neiman Marcus, and Bloomingdale's, and at independent specialty stores, including

5

Mitchells, Richards, and Atelier. Def. 56.1 ¶ 71. None of these stores ever offered Plaintiff's goods for sale. *Id.* Ms. Schad was unable to identify any specific stores that have ever sold both Plaintiff's products and Tod's products. *Id.* ¶ 125. However, Plaintiff asserts that both parties' products are sold on reselling platforms Poshmark and The RealReal, which are third-party resale platforms. Pl. Counter 56.1 ¶ 125.

Defendants assert that they have "consistently used Ts and double Ts as designs on their products to identify the TOD'S brand." Def 56.1 ¶ 57. Since at least 2006, Tod's has used variations of a T-shaped or bar-like design in connection with shoes, belts, leatherware, bags, and sunglasses. *Id.* ¶ 58. Plaintiff disputes Defendants' assertion and states that Defendants have never used T-shaped hardware or designs as a trademark. Pl. Counter 56.1 ¶ 58.

In 2015, Defendants engaged independent contractor Monica Chiozzi, who contributed design work on women's leather goods, including handbags for the Spring/Summer 2016 season. Def. 56.1 ¶ 60. Ms. Chiozzi designed Tod's Double T design shown below, which debuted in September 2015 as part of the Spring/Summer 2016 collection:



*Id.* ¶ 63; Joint 56.1 ¶ 41. Ms. Chiozzi did not recall when she created the sketches for this Double T design, but testified that it was likely several months before the June 2015 date on the drawings. Def. 56.1 ¶¶ 67–68.

On November 13, 2015, Defendants filed three trademark applications with the USPTO seeking to register three variations of the Tod's Double T design:



*Id.* ¶ 84. Prior to applying for this mark, Defendants did not conduct a trademark clearance search for double T trademarks. Joint 56.1 ¶ 44. The USPTO approved Tod's Double T applications. Def. 56.1 ¶ 85. The TOD'S word trademark generally appears on Defendants' products themselves, including the Double T products. *Id.* ¶ 72.

Defendants introduced its first products bearing this Double T design as part of the Spring/Summer 2016 collection, which it began promoting as early as March 2016. *Id.* ¶ 74. In this collection, the Double T design was featured on handbags and shoes. *Id.* ¶ 75. Defendants later extended the design to accessories, including wallets, keychains, and belts. *Id.* ¶ 76. However, Defendants assert that the vast majority of total sales of Tod's Double T products came from its footwear. *Id.* There is no evidence that Plaintiff ever used Plaintiff's Double T Mark on glasses, sunglasses, cufflinks, shoes, and belts—only bags and wallets. *Id.* ¶¶ 123–24; Pl. 56.1 ¶¶ 9, 14; *see also* Def. Counter 56.1 ¶ 2 (noting that Plaintiff's sales records indicate the sale of eight wallets). Between 2016 and 2022, Defendants' sale of products bearing their Double T mark totaled at least $34,000,000. Joint 56.1 ¶ 47.

Defendants promoted their Double T products through an advertising campaign from 2016 through 2018, which included extensive social media postings, magazine advertisements, and collaborations with celebrities, influencers, and various fashion industry professionals. *Id.* ¶¶ 48–63. In 2018, sales of Tod's Double T products totaled ███████, while sales in 2022 ██ ████████████. Def. 56.1 ¶ 89.

Ms. Schad first became aware of Tod's Double T products in July 2018. *Id.* ¶ 77. Ms. Schad testified that Tod's Double T mark was "probably synonymous with [Defendants'] brand in certain circles," and was probably more famous in Europe than in the United States. *Id.* ¶ 81. Additionally, Ms. Schad testified that she has seen other double T or Roman numeral II designs, and that in some instances she considered certain of these marks as similar enough to Tribe of Two's Mark that she thought it warranted consulting legal counsel. *Id.* ¶¶ 102, 106, 108. For instance, Tory Burch owns several trademark registrations for a double T logo, as shown below:



*Id.* ¶ 93. Defendants also note, and Ms. Schad acknowledges, that similar double T marks exist, from companies including Turq N Taupe, TT Goering, The Togethership, and Valttino.



Pl. Counter 56.1 ¶¶ 104–06, 108.

Furthermore, in response to an interrogatory asking Plaintiff to identify all people Plaintiff knows or believes to have experienced actual confusion between Plaintiff and Defendants or their respective trademarks or products, Plaintiff identified three specific individuals. Def. 56.1 ¶ 111. Two of these individuals are Ms. Schad's close friends, who contacted her because they believed Tod's was using Plaintiff's Double T logo. Pl. Counter 56.1 ¶ 112. These two individuals knew that the Tod's product bearing the Double T logo was not Plaintiff's product. Def. 56.1 ¶ 112. The other specific instance of confusion that Plaintiff identified occurred at a January 18, 2018 private Tribe of Two event. *Id.* ¶ 113. There, a potential customer told Ms. Schad that the bag she was considering purchasing looked similar to Tod's and, according to Ms. Schad, the potential customer declined to purchase the bag because she "didn't want people to think that they had been given a Tod's bag." Pl. Counter 56.1 ¶ 113. Plaintiff asserted in a response to an interrogatory that "other people" have "ask[ed] about the logo vs Tod's," but did not provide further information as to the precise nature of such inquiries. Def. 56.1 ¶ 114.

## II.    Procedural Posture

The USPTO approved Tod's Double T applications and published them for opposition on July 25, 2018. Def. 56.1 ¶ 85. In September 2018, Plaintiff sent a demand letter to Tod's, objecting to its Double T marks. *Id.* ¶ 86; Joint 56.1 ¶ 65. On December 12, 2018, Plaintiff filed a notice of opposition before the Trademark Trial and Appeal Board ("TTAB") of the USPTO, opposing Tod's trademark applications for its Double T marks. Def. 56.1 ¶ 87; Joint 56.1 ¶ 67. Plaintiff's submission, No. 91245265, opposed Defendants' trademark applications under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), arguing that Defendants' Double T mark is

confusingly similar to Plaintiff's Mark. Joint 56.1 ¶ 67. After filing this lawsuit on April 19, 2023, Plaintiff moved for suspension of the TTAB opposition, which TTAB suspended on May 17, 2023, pending disposition of the present action. Def. 56.1 ¶ 88.

On July 24, 2023, Defendants answered. ECF No. 20. In their answer, Defendants raised several defenses, including prior use based on tacking. *Id.* ¶¶ 83–92. Defendants also raised two counterclaims against Tribe of Two: (1) trademark infringement, false designation of origin, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and (2) cancellation of Tribe of Two's Double T Mark, Reg. No. 5924569. *Id.* at 14–19. On August 14, 2023, Tribe of Two answered Defendants' counterclaims. ECF No. 24.

On March 17, 2025, Defendants filed *Daubert* motions to preclude the testimony of proffered experts Gabriele Goldaper, Jon A. Krosnick, and William Christopher "Silver" Smith. ECF Nos. 109, 113, 116. On the same day, Plaintiff filed *Daubert* motions to preclude the testimony of proffered experts Ivan T. Hofmann, Jonathan Hochman, Dr. Stephen Nowlis, and Dr. Itamar Simonson. ECF Nos. 121, 126, 131, 136.

On April 21, 2025, Plaintiff informed the Court of its intention to "withdraw the Expert Report of Gabriele Goldaper . . . in its entirety, and that Plaintiff does not intend to call Ms. Goldaper as a trial witness." ECF No. 174. The parties jointly requested that the Court deny as moot Defendants' Motion to exclude Ms. Goldaper's report, opinions, and testimony. *Id.*

On January 16, 2026, both Defendants and Plaintiff filed summary judgment motions. ECF Nos. 191, 195. Defendants move for summary judgment and the dismissal of Plaintiff's case. ECF No. 209 ("Def. SJ") at 2. Defendants do not move for summary judgment as to their counterclaims. *See* Def. SJ. Plaintiff requests summary judgment on the issues of priority and

liability for trademark infringement. ECF No. 214 ("Pl. SJ") at 8. The parties also filed their Rule 56.1 statements. ECF Nos. 192, 194, 197–98, 212, 215–16.

The parties have also filed various motions to seal. ECF Nos. 120, 154, 159, 190, 193, 224, 227, 231, 234, 253, 261, 267. The parties do not oppose each other's motions to seal. The Court temporarily granted these motions to seal, and assesses sealing while determining the parties' motions for summary judgment. ECF Nos. 155, 268.

## LEGAL STANDARD

In considering cross-motions for summary judgment, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021) (citing *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)). To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. If the movant meets its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (cleaned up).

When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*,

11

554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In determining whether there are genuine issues of material fact," a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal quotation marks and citation omitted).

## DISCUSSION

### I.    The Court Grants Defendants' Motion for Summary Judgment

The Court grants Defendants' Motion for Summary Judgment as to both Plaintiff's trademark infringement and unfair competition claims under the Lanham Act.

#### A.  Defendants Are Entitled to Judgment as a Matter of Law as to Plaintiff's Lanham Act Claims

The Lanham Act imposes civil liability on any person who, without the consent of the registrant,

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(a). "Courts analyze trademark infringement claims under a two-step test that asks, 'first whether the mark merits protection and, second, whether the allegedly infringing use of the mark (or a similar mark) is likely to cause consumer confusion.'" *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 435 (S.D.N.Y. 2020) (quoting *Victorinox AG v. B&F Sys.*, Inc., 709 F. App'x 44, 47 (2d Cir. 2017), *as amended* (Oct. 4, 2017) (summary order)).

The Lanham Act also prohibits any person from using in commerce, in connection with any goods,

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1)(A). The "central inquiry" under this section is the "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir. 2000) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978)). This "test utilizes the same principles and standard as are used for trademark infringement claims." *Chanel, Inc.*, 449 F. Supp. 3d at 436.

In analyzing Plaintiff's trademark infringement and unfair competition claims under the Lanham Act, the Court first declines to consider whether Plaintiff's Mark merits protection, but instead determines that no reasonable juror could find a likelihood of confusion between Plaintiff's and Defendants' Double T marks.

### 1.  Plaintiff Owns Valid Trademark Rights, but the Court Need Not Determine Protectability

A plaintiff claiming trademark infringement or unfair competition under the Lanham Act "must show that it owns a valid trademark eligible for protection." *EMI Catalogue*, 228 F.3d at 62; *see also Victorinox AG*, 709 F. App'x at 47. "A certificate of registration with the [US]PTO is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a)). "When a plaintiff sues for infringement of its registered trademark, the defendant bears the burden to rebut the mark's protectability." *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018). In contrast, "[i]f the allegedly infringed mark is unregistered, the burden is on plaintiff to prove that its mark is a valid trademark." *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 520 (S.D.N.Y. 2019) (internal quotation marks omitted).

Here, it is uncontested that Plaintiff owns a registered, incontestable trademark, with registration No. 4377523, for its Tribe of Two Double T Mark. Joint 56.1 ¶¶ 9–11. Tribe of Two began using this Double T Mark (with the words "TRIBE OF TWO" above the Double T symbol) as early as December 1, 2012, and the USPTO issued this registration on July 30, 2013. *Id.* ¶¶ 8–9. Tribe of Two also owns a registered mark, Registration No. 5924569, for its wordless Double T symbol. *Id.* ¶¶ 12–13. The USPTO issued this mark on December 3, 2019. *Id.* ¶ 13.

Defendants do not rebut that Plaintiff's marks are protectible, but instead raise two defenses. ECF No. 245 ("Def. Opp.") at 4–12. First, they argue that their Double T mark can be tacked on to their use of a prior Double T symbol (the "Curved Double T") that predates Plaintiff's Mark. Def. Opp. at 4–8. Second, they contend that their prior use of yet another

14

Double T symbol (the "Mirror Double T") has priority over Plaintiff's Double T. *Id.* at 8–12. The Court, however, declines to address these defenses. Because the Court determines below that no reasonable juror could find that there is a likelihood of confusion between Plaintiff's and Defendants' Double T marks, the Court need not and does not consider Defendants' tacking and priority defenses.

### 2.    There Is No Likelihood of Confusion

"To prevail in a federal trademark infringement claim, a plaintiff 'must demonstrate that . . .  the defendant's actions are likely to cause confusion with [that] mark.'" *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022) (quoting *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020)). "[S]atisfaction of the likelihood-of-confusion standard requires a probability of confusion, not a mere possibility." *Guthrie Healthcare Sys.*, 826 F.3d 27, 37 (2d Cir. 2016) (internal citation and quotation marks omitted). "[T]he question on summary judgment is whether, viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in its favor, *any* reasonable trier of fact could find a likelihood of confusion." *Groq, Inc. v. Groq Health, Inc.*, No. 23-CV-8325 (MKV), 2026 WL 734804, at *7 (S.D.N.Y. Mar. 16, 2026).

"Trademark infringement cases most commonly involve 'forward confusion'—that is, where a junior user uses the mark of a senior user (i.e., the party that first used the mark) to sell goods or services based on the misperception that they originate with the senior user." *Marlinspike Hall LLC v. Bar Lab Concepts LLC*, No. 23-CV-2997 (JPO), 2023 WL 6847208, at *4 (S.D.N.Y. Oct. 17, 2023). However, in this case, Plaintiff brings a reverse confusion claim. Pl. SJ at 8; *see also* Def. Opp. "Reverse confusion occurs when consumers 'believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user.'" *RiseandShine*

*Corp.*, 41 F.4th at 119 (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991)). "Reverse confusion can occur when the junior user has superior resources and leverages those resources to saturate the market." *Marlinspike Hall LLC*, 2023 WL 6847208, at *4.

The parties agree that the factors set forth in the Second Circuit's *Polaroid* opinion governs reverse confusion cases. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961); Def. SJ at 6; Pl. SJ at 19. *Polaroid* provides a non-exhaustive list of eight factors that courts consider in evaluating trademark infringement under the Lanham Act:

> the strength of [Plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). The "evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (internal citation and quotation marks omitted). Nevertheless, "the Second Circuit has explained that strength, similarity, and proximity are generally the three most important *Polaroid* factors." *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*, 7 F. Supp. 3d 385, 399 (S.D.N.Y. 2014) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987)).

Even in reverse confusion cases, the strength of a plaintiff's mark "is often the most important factor." *RiseandShine Corp.*, 41 F.4th at 119. "Although no one factor is necessarily dispositive, any one factor may prove to be so." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001). Additionally, "[it] is important to keep in mind that the

16

Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets." *Id.* (internal quotation marks and citation omitted).

The Second Circuit is "one of three circuits, along with the Sixth and Federal Circuits, that consider likelihood of confusion to be a question of law." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 326 n.4 (2d Cir. 2020). Specifically, "[t]he Second Circuit treats each prong of the *Polaroid* test as a question of fact, though the district court's balancing of the factors is treated as a matter of law." *BeautyBank, Inc. v. Harvey Prince, LLP*, No. 10-CV-955 (AJN), 2013 WL 11327097, at *8 (S.D.N.Y. Mar. 29, 2013). "Though likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment in appropriate cases." *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 246 (2d Cir. 1983) (internal citation omitted).

The Court now considers each factor in turn, before ultimately concluding that no reasonable juror could find a likelihood of confusion.

### i.    Strength of the Mark Favors Defendants

"The strength of a mark is a measure of its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source." *Marlinspike Hall LLC*, 2023 WL 6847208, at *5 (internal citation and quotation marks omitted). Generally, "[t]he strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength." *RiseandShine Corp.*, 41 F.4th at 120.

Preliminarily, the parties dispute *which* mark's strength should be analyzed in this reverse confusion case. In a reverse confusion case, the Second Circuit considered the strength of *the*

17

*plaintiff's mark* in analyzing this factor. *RiseandShine*, 41 F.4th at 120; *see also Marlinspike Hall LLC*, 2023 WL 6847208, at *5 ("In a likelihood of reverse confusion case, as in a likelihood of forward confusion case, the Second Circuit considers the strength of the senior user's mark." (citing *RiseandShine*, 41 F.4th at 121–24; 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed.) ("[T]he Second Circuit . . . takes the position that in reverse confusion cases, the question of strength is the same as in forward confusion: the senior user must prove that its mark is strong."))).

Although there are some reverse confusion cases in which a "court should look to the *comparative* strength of the *junior user's* . . . mark when assessing the first *Polaroid* factor," this is not such a case. *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 185 (S.D.N.Y. 2011); *see also Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12-CV-4112 (AJP), 2014 WL 814532, at *13 (S.D.N.Y. Mar. 3, 2014) (stating that "in some circumstances the commercial weakness of a mark will weigh in favor of a reverse confusion finding"). This is because "there is no evidence of any negative correlation between [the junior user's] use of [its] design and [the senior user's] lack of success." *Denimafia*, 2014 WL 814532, at *13; *see infra* Section I(A)(2)(v).

Turning first to inherent strength, "[t]o describe different degrees of inherent distinctiveness, the trademark law utilizes four categories. In order of ascending strength, they are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *RiseandShine Corp.*, 41 F.4th at 120. "Once a mark has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question." *Star Indus. Inc. v. Bacardi & Co. LTD*, 412 F.3d 373, 385 (2d Cir. 2005) (internal quotation marks omitted). "[M]arks are entitled to a presumption of

inherent distinctiveness by virtue of their incontestability." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 451 (2d Cir. 2004).

Here, Defendants concede that Plaintiff's Mark, which is an incontestable trademark, is "inherently distinctive." Def. SJ at 7; *see also* Def. Opp. at 13 (recognizing the "inherent distinctiveness" of Plaintiff's Mark). Additionally, Plaintiff's Mark, which is an abstract image that does not evoke handbags or even fashion generally, is arbitrary and fanciful. The parties agree that Plaintiff's "Double T bears no descriptive relation to handbags or leather goods." Joint 56.1 ¶ 15.

Nevertheless, "it is well established that extensive third-party usage of a mark in related products generally weighs against a finding that a trademark is strong." *Groq*, 2026 WL 734804, at \*10. Defendants point the Court to similar Double T marks, including those used by the fashion-related businesses Turq N Taupe (a jewelry business) and Valttino (a Spanish fashion brand):



Def. 56.1 ¶¶ 104–06, 108. These third-party Double T marks demonstrate that Plaintiff's Double T symbol is not an especially creative or unique design.

Plaintiff tries to differentiate these marks by noting that these third-party businesses do not produce luxury women's handbags. Pl. SJ at 3, 5. However, the Second Circuit has suggested that third-party usage of marks for similar, but not identical, product types still may suggest a

mark's inherent weakness. *See RiseandShine Corp*, 41 F.4th at 123 (considering "evidence of over 100 uses of [a term] in connection with coffee, tea, bottled beverages, energy drinks, soft drinks, drinkable health supplements, cafes, yogurts, and granolas" when analyzing the strength of a mark for canned coffee); *see also Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 243 n.18 (S.D.N.Y. 2022), *aff'd,* No. 23-12-CV, 2024 WL 1152520 (2d Cir. Mar. 18, 2024) (stating that "the Second Circuit has never held that evidence of third-party registrations should be limited to the narrow market in question"). Here, the usages are all in the fashion industry, and given the similarities among the designs, these third-party marks still demonstrate the weakness of Plaintiff's Mark. Accordingly, the usage of similar marks by third parties militates against a finding of a likelihood of confusion.

In evaluating the strength of the mark, the Court must also consider the parties' marks' marketplace strength. *See Brennan's Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004). Marketplace strength refers to the "recognition that plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services." *Id*. "Even an inherently distinctive mark can, in its commercial context, lack strength as a mark." *Nora Beverages*, 269 F.3d at 123. Marketplace strength is determined by analyzing the following factors: "advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Car-Freshner Corp.*, 980 F.3d at 329. The Court considers each of the relevant factors here.

First, "[t]he sales success of a product 'may be indicative of whether or not a substantial portion of the purchasing public associates the [mark] with the source of the goods.'" *RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 320 (E.D.N.Y. 2021)

20

(quoting *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 358 (S.D.N.Y. 1998)). Here, Plaintiff's Mark has very low marketplace strength, evidenced primarily by Plaintiff's low sales. Plaintiff appears to concede its relatively weak marketplace strength. *See* Pl. SJ at 22. Between 2012 and 2022, for example, Tribe of Two generated only approximately ████ in sales and sold only ████ in connection with the Tribe of Two Double T. Joint 56.1 ¶ 21.

Second, Plaintiff's advertising expenditures are minimal, with Plaintiff spending only nominal amounts on advertising over the past decade. "Advertising expenditures provide circumstantial evidence of the possible effect that advertising of the trademark or service mark may have on consumers' association of it with the source of a product or service." *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 319 (S.D.N.Y. 2012). Plaintiff advertised through "business cards, posters, flyers," social media, "product placement, special events, and invitation-only showings," in addition to magazine advertisements and "attendance at a few trade shows." Pl. Counter 56.1 ¶¶ 31–32. Plaintiff concedes that it never advertised on television, radio, or third-party websites. *Id.* ¶ 30. Indeed, the evidence shows that Plaintiff's advertising expenditures amounted to approximately only ████ , between 2013 and 2024. Def. 56.1 ¶¶ 28–29.

Even Plaintiff's product placement in prominent television shows does not weigh in its favor. Plaintiff concedes that its Mark was not displayed in those placements. Pl. Counter 56.1 ¶ 33 (conceding that Plaintiff's Double T Mark was not visible in television product placements). In assessing advertising expenditures, "[i]t must be shown that there was promotion of the mark as an identifier for the product." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 150 (S.D.N.Y. 2022) (citation omitted). In sum, Plaintiff offers no evidence that its advertising efforts were "successful in associating the [Mark] with the plaintiff in minds of consumers."

21

*Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141, 158 (S.D.N.Y. 2011). Therefore, neither Plaintiff's sales success nor its advertising revenues provide probative evidence of acquired strength.

Furthermore, none of the remaining factors support the market strength of Plaintiff's Mark. Plaintiff produced no consumer study in this action linking Plaintiff's Mark to its source and identified no unsolicited media coverage of the product or alleged attempts to plagiarize the Mark. And Plaintiff used its Double T Mark exclusively for at most three years. *See* Joint 56.1 ¶ 5–7, 41 (establishing that Plaintiff developed and registered its first Double T Mark in May 2012, while Defendants debuted their Double T mark in September 2015). Courts have concluded that exclusive usage for even longer periods of time does not suggest that a mark is strong. *See Jackpocket, Inc.*, 645 F. Supp. 3d at 249 (collecting cases that concluded that exclusive use periods lasting five to seven years were not sufficient to demonstrate secondary meaning).

Therefore, even to the extent that Plaintiff's Mark has some level of distinctiveness, its market strength is decidedly weak. And as the Second Circuit has made clear, "[w]eak marks are entitled to only an extremely narrow scope of protection, unless a convincing combination of other *Polaroid* factors militates strongly in favor of likelihood of confusion." *RiseandShine*, 41 F.4th at 124 (quoting *Plus Prod. v. Plus Discount Foods, Inc.*, 722 F.2d 99, 1006 (2d Cir. 1983)) (internal quotations omitted). As in *RiseandShine,* "no such circumstances exist here." *Id.*

### ii.    Similarity of the Marks Slightly Favors Plaintiff

"In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Star Indus.*, 412 F.3d at 386 (quoting *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)). "Factors which courts consider in this

regard include mode of presentation, typeface, inclusion of additional words, dress colors, and associated tie-ins, such as a mascot." *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 587 (S.D.N.Y. 2015). "The key question in evaluating whether marks are similar is whether they create the same overall impression such that a consumer who has seen Plaintiff's mark would, upon later seeing Defendant[s'] mark, be confused about the origin or association of the parties' products." *Groq, Inc.*, 2026 WL 734804, at *9.

Here, the parties' Double T symbols, standing alone, have some visual similarities. Both marks involve the use of two connected Ts. There are, however, several key differences. The vertical orientation of Plaintiff's Mark makes the Double T appear like a Roman numeral II, which, as Ms. Schad testified, was done purposefully to represent the name and its two owners. Joint 56.1 ¶ 4, 6. On the other hand, Tod's mark, which lies horizontally on its handbags, does not leave that same impression. *Compare* Def. 56.1 ¶ 75; Pl. 56.1 ¶ 53 *with* Pl. 56.1 ¶ 19. Unlike Plaintiff's Mark, the horizontal orientation of Tod's mark does not look like a Roman numeral II, and there is a noticeable gap between its interlocking T's. The T's used in each mark are also stylistically different—Plaintiff uses straight, block lettering, while Defendants' mark includes rounded, more cylindrical edges. These differences, while slight, leave an overall different impression between the marks.

**Tribe of Two's Double T Mark**                    **Tod's Double T Mark**



Joint 56.1 ¶¶ 7, 43.

**Defendants' Double T**



 

Def. 56.1 ¶ 75; Pl. 56.1 ¶ 53.

**Plaintiff's Double T**



Pl. 56.1 ¶ 19.

Furthermore, it is well-settled that "[w]hen prominently displayed[, trade names] can go far towards eliminating any possible confusion." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992); *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 106–07, 116 (2d Cir. 2009) (marks are "minimally similar" where defendant's products are presented "in packaging that displays the [defendant's brand] name in no subtle manner"). In this case, the parties' word trademarks often appear on the parties' products themselves. Def. 56.1 ¶ 72; Pl. Counter 56.1 ¶ 47. Defendants' Double T mark includes the word "TOD'S" on two of three of its versions. Def. 56.1 ¶ 73. Similarly, many of Plaintiff's bags bear metal bag tags inside the bags that include Plaintiff's Double T logo below the words "TRIBE OF TWO." Pl. Counter 56.1 ¶ 47. Although the parties' trade names are not included above all Double T symbols in all of their products, that their trade names are included on or alongside their Double T symbols on many of their products still partially militates against finding a likelihood of confusion.

In sum, while the overall impression of these marks is decidedly different, there are some visual similarities between the parties' respective Double T symbols. Therefore, this factor, at most, only weakly favors Plaintiff when evaluating "the likely effect on consumers of the marks'

[potential similarities] *with a focus on market conditions.*" *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 539 (2d Cir. 2005).

### iii.    Proximity of the Products Favors Defendants

"The proximity inquiry asks to what extent the two products at issue compete." *Wonderful Co. LLC v. Nut Cravings Inc.*, No. 23-7540-CV, 2025 WL 212064, at *3 (2d Cir. Jan. 16, 2025). "The inquiry comprises two elements, market proximity and geographic proximity." *Id.* "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id.* (quoting *Brennan's, Inc.*, 360 F.3d at 134).

As an initial matter, there is only some overlap in Plaintiff's and Defendants' product type. Unlike Defendants, Plaintiff has never used its Double T Mark on glasses, sunglasses, cufflinks, or shoes, and has similarly provided no evidence of ever having used its Double T on belts. Def. 56.1 ¶ 123–24; *see also id.* ¶ 76 (stating that the bulk of Defendants' Double T product sales were shoes). However, as discussed above, both parties have used their Double T logo on handbags. *See supra* Section I(A)(2)(ii). Additionally, both parties have used their Double T logo on wallets, although this fact weighs little in the Court's analysis, because the evidence shows that Plaintiff has only sold eight wallets. Def. 56.1 ¶ 76; Def. Counter 56.1 ¶ 2.

Furthermore, the parties' products are not in competitive proximity. Products may "be in competitive proximity despite the fact that they were never sold in the same stores, where the products appealed to the same consumers, and sale locations were geographically close, and consumers who visited stores selling the one product were reasonably likely to visit nearby retail stores where the other was sold, creating the opportunity for confusion." *Star Indus.*, 412 F.3d at 386 (cleaned up). Similarly, the Second Circuit has found this factor satisfied where competing products were not sold "side by side in the same brick-and-mortar stores[,]" but were both sold

on the same third-party website—in that case, Amazon.com. *Wonderful Co. LLC*, 2025 WL 212064, at *3.

Here, Plaintiff identifies no stores that have ever sold both Plaintiff's products and Tod's products, other than third-party resale platforms Poshmark and The RealReal. Pl. Counter 56.1 ¶ 125–26. Defendants distribute their products through company-owned stores, franchised stores, major department stores, and e-commerce, including Tod's own website and websites operated by wholesale partners. Def. 56.1 ¶¶ 69, 71. Defendants assert that approximately 75% of U.S. consumer sales from 2015–2022 occurred through Tod's boutiques and outlets. *Id.* ¶ 70. In contrast, "Plaintiff has sold its products through house parties, invitation-only trunk shows and other private events, consignment sales at stores, direct sales to stores, the Tribe of Two website, and two to three trade shows." *Id.* ¶ 34. Plaintiff's top two channels of sales by revenue ███ ████████████████████████████████████████. *Id.* ¶ 35.

Overall, Tod's products are predominately sold in its own boutiques and outlets, and secondarily in department stores and through e-commerce, while Plaintiff's products are sold ████████████████████████████████. *Id.* ¶¶ 34, 70. These particular channels of commerce reduce confusion, because shopping at branded boutiques or branded house parties implies that consumers know what brand they are buying. Therefore, this is not a case in which "consumers who visited stores selling the one product were reasonably likely to visit nearby retail stores where the other was sold, creating the opportunity for confusion." *Star Indus.*, 412 F.3d at 386.

Finally, the fact that some of the parties' products end up on Poshmark and The RealReal does not change this result. These sites are resale platforms through third-party intermediaries and not the parties' own distribution channels. There is also no other overlap of e-commerce

sales, because Plaintiff concedes that it has not made any direct sales through third-party websites. Pl. Counter 56.1 ¶ 37.

In sum, there is incomplete overlap as to the type of products at issue. Additionally, the parties' channels of commerce also differ significantly. Therefore, this factor decisively weighs in favor of Defendants.

#### iv.    The Bridging-the-Gap Factor Is Inapplicable Here

This factor "examines whether the prior user may wish to enter the defendant's market in the future." *Paddington Corp. v. Attiki Imp. & Distrib., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993). The parties agree that this factor "is inapplicable." Pl. SJ at 29; *see also* Def. Opp. at 24 n.12 ("The bridging the gap [factor is] of little significance here."). Therefore, because the "parties are [already] in the same industry and provide the same services, this factor is inapplicable here." *Urbanride, Inc. v. Urb. Worldwide, Inc.*, No. 23-CV-6999 (JAV), 2026 WL 880256, at *5 (S.D.N.Y. Mar. 31, 2026).

#### v.    Evidence of Actual Confusion Is *De Minimis*

"Consumer confusion can involve mistaking the origin of a particular product or service, or whether there is an affiliation between the two of them." *Flushing Bank*, 138 F. Supp. 3d at 589. "Actual confusion need not be shown in order to prevail on a Lanham Act claim"—only "a likelihood of confusion" is required. *Id.* However, "while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of such proof would be necessary to refute such proof." *Savin Corp.*, 391 F.3d at 459 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971)). Nevertheless, "anecdotal evidence must be 'more than *de minimis*.'" *Jackpocket, Inc.*, 645 F.

Supp. 3d at 259 *(quoting Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 312 (S.D.N.Y. 2010)).

"[E]vidence of actual confusion [is] extremely weak" when a plaintiff's "evidence of actual confusion consist[s] entirely of testimony by several interested witnesses recounting a handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants." *Star Indus.*, 412 F.3d at 387–88. Additionally, the fact that Plaintiff failed "to present its own consumer survey [regarding actual confusion] weighs against a finding of consumer confusion." *Id.* at 388; *see also Car-Freshner Corp.*, 980 F.3d at 332 (holding that the actual confusion factor favored a defendant when the plaintiff "could find only one customer even arguably confused" and "produced no survey evidence"); *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, No. 96-CV-9469 (RWS), 1999 WL 191527, at *12 (S.D.N.Y. Apr. 7, 1999) ("[A] plaintiff's failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." (collecting cases)).

Here, Tribe of Two presented only weak, anecdotal evidence suggesting potential confusion from several of Ms. Schad's friends, and no consumer survey finding consumer confusion. *See* Pl. 56.1 ¶¶ 83–86. Indeed, most of the anecdotes of confusion Plaintiff points to do not even demonstrate actual confusion. A few of Plaintiff's friends told Ms. Schad that her products and/or logo looked like Tod's. *See* Def. Counter 56.1 ¶¶ 83–84, 86. Her best friend also testified that the logo on a Tod's bag carried by a celebrity looked like Plaintiff's logo. *Id.* ¶ 86. Setting aside the admissibility of statements made to Ms. Schad about the logos, this evidence does not demonstrate confusion. Each of Ms. Schad's friends recognized the distinction between the two bags, and they were not in fact confused as to the origin of the products. *See* Def. Counter 56.1 ¶ 84 ("All three of these individuals knew that the Tribe of Two products were not

Tod's products"); Def. 56.1 ¶ 112. At most, the evidence suggests a mere recognition of similarity between Plaintiff's and Defendants' marks. *See Nora Beverages*, 269 F.3d at 124 ( "Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion[, but rather] are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.").

In its Motion for Summary Judgment, Plaintiff appears to concede its lack of evidence of actual confusion. *See* Pl. SJ at 29–30. Although the absence of evidence of actual confusion "is not fatal" to Plaintiff's trademark claims, this factor clearly militates against finding a likelihood of confusion. *Car-Freshner Corp.*, 980 F.3d at 332.

### vi.    There Is No Evidence of Bad Faith

Bad faith is satisfied where there is evidence that the junior user "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991). The burden of proving bad faith rests with the party claiming infringement. *J.T. Colby & Co. v. Apple Inc.*, No. 11-CV-4060 (DLC), 2013 WL 1903883, at \*23 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir. 2014) (citing *Star Indus.*, 412 F.3d at 388).

Here, Plaintiff has failed to prove that Defendants acted in bad faith. Indeed, Plaintiff offers no evidence that any of Defendants' employees or agents knew of Plaintiff's Double T Mark prior to proceedings related to the present suit. Rather, Plaintiff argues that "bad faith can be inferred" because "a cursory trademark search would have put Tod's on notice of Tribe of Two's prior rights in its Double T logo." Pl. SJ at 30. Plaintiff is mistaken. The Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search." *Star Indus.*, 412 F.3d at 388; *see also J.T.*

*Colby*, 2013 WL 1903883, at *23 ("The failure of a defendant to conduct a trademark search, however, is not sufficient to demonstrate bad faith."). Furthermore, even if Plaintiff established that Defendant knew of Plaintiff's Mark, "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, [the Second Circuit] has found the junior user to be in good faith." *Star Indus.*, 412 F.3d at 388. There is no such evidence in this case. Therefore, this factor weighs in favor of Defendants.

### vii.    Quality of the Products Favors Neither Party

"In the context of reverse confusion, a buyer will be less likely to assume that the better-known junior user has produced the senior user's products if the two products are of noticeably different quality." *J.T. Colby*, 2013 WL 1903883, at *25; *see also Star Indus.*, 412 F.3d at 389 (stating that "a very marked difference in quality between the two products would militate against finding a likelihood of confusion as consumers 'will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user.'" (quoting *Savin Corp.*, 391 F.3d at 461)).

Here, the parties make no comparisons of the quality of the parties' products and only cursorily address this factor. *See* Pl. SJ at 30 (stating that the quality of product "factor favors Tribe of Two or is neutral"); Def. Opp. at 24 n.12 ("The . . . quality of good factor[ is] of little significance here."). Therefore, this factor is evenly balanced and is of minimal effect. *See Star Indus.*, 412 F.3d at 389 (finding that this factor was "at most evenly balanced" when the parties make no allegations that one party's product is of inferior quality to the others); *J.T. Colby*, 2013 WL 1903883, at *25 (determining that this factor favored neither party when the "parties . . . submitted little to no evidence on the relative quality of their products").

###### viii.    Sophistication of Customers Favors Defendants

The consumer sophistication factor "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412. F.3d at 390 (internal citation omitted). "In a reverse confusion case, the consumers relevant to this inquiry are those who purchase the plaintiff's products." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 676 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (cleaned up).

Generally, "[a] sophisticated consumer is less likely to be confused by similar marks than is a casual shopper." *J.T. Colby*, 2013 WL 1903883, at *25. "[I]n some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." *Star Indus.*, 412 F.3d at 390. "In general, '[t]he greater the value of an article the more careful the typical consumer can be expected to be.'" *LVL XIII*, 209 F. Supp. 3d at 676 (quoting *McGregor–Doniger v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979)). Here, Plaintiff sells "luxury handbags crafted in exotic materials . . . ranging in price from $1000 to $3000." Joint 56.1 ¶ 2. Therefore, Plaintiff's customers are clearly sophisticated.

Plaintiff cites caselaw, all over 25 years old, that indicates that there are instances in which "market sophistication might in some circumstances increase the likelihood of confusion." *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999); *see* Pl. SJ at 30–31. However, later cases have distinguished this line of cases as applying "only where both the products and marks at issue are identical." *LVL XIII*, 209 F. Supp. 3d at 677 (internal quotation marks omitted). As previously discussed, this is not the case here. "[G]iv[en] the attention such purchasers usually give in buying [this] class of goods," the sophistication of

32

Plaintiff's customers do not support a likelihood of confusion. *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996).

### ix.    Balancing the Factors Demonstrates There Is No Likelihood of Confusion

Considering each of the *Polaroid* factors, and drawing all inferences in Plaintiff's favor, Plaintiff has failed to raise a genuine issue of material fact with respect to the likelihood of confusion. The strength of mark, proximity of the products, actual confusion, bad faith, and sophistication of customer factors all clearly favor Defendants. A reasonable factfinder could conclude that similarity of the marks moderately or weakly favors Plaintiff, or even that the factor is neutral. The other factors (bridging the gap and quality of products) are decidedly inapplicable or neutral here. Therefore, the factors clearly favor Defendants.

Even if the similarity-of-the-marks factor weighed heavily in favor of Plaintiff, it would not be enough to overcome the minimal likelihood of confusion. *See Savin Corp.*, 391 F.3d at 462 (affirming a grant of summary judgment for defendant when only one of the *Polaroid* factors, similarity of marks, weighed in the plaintiff's favor); *Star Indus.*, 412 F.3d at 391 (affirming summary judgment for defendants when "[plaintiff] made a strong showing on none of the *Polaroid* factors, and a weak showing on one, while five of the six that were other than neutral came out in favor of [defendants], two of them strongly"); *Denimafia Inc.*, 2014 WL 814532, at *25 (determining that summary judgment was warranted for a defendant, even if weakness of the mark was held to weigh against it and its survey evidence was discounted, because the remaining factors all either weighed in defendant's favor or were neutral).

The Court is mindful that this balancing is not a mechanical application of the factors—that judgment is not warranted simply by tallying the factors on each party's side. Rather, the totality of the evidence, particularly the weakness of Plaintiff's acquired strength, lack of

commercial channel overlap, and absence of actual confusion, weigh insurmountably in favor of finding that consumers are unlikely to be confused. Therefore, the Court grants Defendants' Motion for Summary Judgment.

## II.    The Parties' *Daubert* Motions Are Denied as Moot

Because the Court grants Defendants' Motion for Summary Judgment, it need not consider the parties' *Daubert* motions. ECF Nos. 109, 113, 116, 121, 126, 131, and 136. *See Shunock v. Apple, Inc.*, No. 23-CV-8598 (JLR), 2026 WL 820207, at *20 (S.D.N.Y. Mar. 25, 2026) ("The parties' *Daubert* motions are likewise dismissed as moot because the Court has resolved the motion on summary judgment.") (collecting cases). Accordingly, the parties' *Daubert* motions are denied as moot.

## III.    Motions to Seal Are Granted

The parties have moved to seal a number of documents that include confidential and commercially sensitive information. They have filed public versions of these documents with proposed redactions. ECF Nos. 120, 159, 190, 193, 224, 227, 231, 234, 253, 261, and 267. No oppositions have been filed. Upon review, the Court finds that the documents at issue do contain sensitive information involving the parties' and third-parties' commercially sensitive and previously non-disclosed financial information. "[C]ourts in this District routinely permit parties to seal or redact commercially sensitive information in order to protect confidential business and financial information." *See In re B & C KB Holding GmbH,* No. 22-MC-180 (LAK) (VF), 2023 WL 2021299, *1 (S.D.N.Y. Feb. 14, 2023) (collecting cases). Accordingly, the motions to seal are granted. Documents that have been temporarily sealed pursuant to these requests shall remain sealed.

**CONCLUSION**

For the reasons stated, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment. The Court DENIES the parties' *Daubert* motions as moot. The Court GRANTS the parties' motions to seal in full. The Clerk of Court is directed to terminate ECF Nos. 191 and 195. Defendants are directed to file a letter, no later than May 18, 2026, confirming whether they intend to pursue their counterclaims in this action.

Dated:  May 11, 2026
       White Plains, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

35